IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTINE REIDY<br>Plaintiff,<br>v.<br><br>JOHN MEZZALINGUA ASSOCIATES, LLC d/b/a JMA WIRELESS<br><br>Defendants. | CIVIL ACTION NO:<br><br>JURY TRIAL DEMANDED |

# COMPLAINT

## I. PRELIMINARY STATEMENT

This action seeks to recover damages, attorney's fees and other relief on behalf of Plaintiff, Christine Reidy ("Plaintiff"), a former employee of Defendant, John Mezzalingua Associates, LLC d/b/a JMA Wireless ("JMA"), to redress JMA's discriminatory employment practices in violation of the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq*. (the "ADA"), and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq*. (the "PHRA"). Plaintiff alleges that during the course of her employment with JMA, she was subjected to acts of discrimination, harassment and retaliation because she had a disability, requested a reasonable accommodation for her disability, and complained of disability discrimination. The culmination of JMA's unlawful acts occurred when JMA terminated Plaintiff's employment on June 20, 2025.

## II. JURISDICTION AND VENUE

1. The Court has jurisdiction of Plaintiff's claims arising under the ADA pursuant to 28 U.S.C. § 1331.

2. The Court has supplemental jurisdiction of Plaintiff's claims arising under the PHRA pursuant to 28 U.S.C. § 1367(a).

3. Venue is proper in this judicial district pursuant to 42 U.S.C. § 2000e-5(f), which has been incorporated by the ADA, based on the following factors:

(a) At all relevant times, Plaintiff has resided in this judicial district and was working for JMA in this district;

(b) JMA authorized Plaintiff to work for it in this judicial district throughout the course of her employment with JMA;

(c) The discriminatory acts and practices of which Plaintiff is complaining were committed in this judicial district, while Plaintiff worked here for JMA;

(d) Plaintiff felt the impact of JMA's discriminatory acts and practices in this judicial district; and

(e) Plaintiff would have continued working for JMA in this judicial district if JMA had not terminated her employment.

## III. <u>FULFILLMENT OF ADMINISTRATIVE REQUIREMENTS</u>

4. All administrative conditions precedent to the filing of this action have been satisfied by Plaintiff.

5. Specifically, on or about July 11, 2025, Plaintiff filed a timely Complaint of Discrimination against JMA with the Pennsylvania Human Relations Commission ("PHRC"), in which she complained of the acts and practices of discrimination alleged herein (the "PHRC Complaint").

6. On or about July 11, 2025, the PHRC Complaint was cross-filed with the Equal Employment Opportunity Commission ("EEOC").

7. On August 27, 2026, at the request of Plaintiff, the EEOC issued to Plaintiff a Notice of Right to Sue informing her that she had 90 days from her receipt of

the Notice to file a lawsuit against JMA pursuant to the ADA. A true and correct copy of the EEOC's Notice of Right to Sue is attached hereto as Exhibit "A".

8. This action is timely under the ADA because it is being filed by Plaintiff within 90 days of her receipt of the EEOC's Notice of Right to Sue.

9. In a letter dated July 30, 2026, the PHRC informed Plaintiff that because more than one year had passed since she had filed the PHRC Complaint, she now had the right to bring an action in court pursuant to 43 P.S. § 962(c) of the PHRA. A true and correct copy of the PHRC's letter to Plaintiff is attached hereto as Exhibit "B".

10. This action is timely under the PHRA because it is being filed well within two years of the date of Plaintiff's receipt of the PHRC's July 30, 2026 letter.

## IV. PARTIES

11. Plaintiff is an adult female and a citizen of the Commonwealth of Pennsylvania, residing in Chester Springs, Pennsylvania.

12. JMA is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business located at 140 Cortland Avenue, Syracuse, New York 13202.

13. JMA is a wireless networking hardware manufacturing company that was founded in 2012 by its current Chief Executive Officer, John Mezzalingua.

14. At all relevant times, JMA acted by and through its agents, servants and employees, acting within the scope of their authority, in the course of their employment, and in furtherance of the mission, affairs and corporate policies of JMA.

15. JMA is and at all relevant times was an "employer" within the meaning of the ADA and the PHRA.

16. At all relevant times, Plaintiff was an "employee" of JMA within the meaning of the ADA and the PHRA.

## V. STATEMENT OF FACTS

### A. Background of Plaintiff's Employment with JMA

17. On or about January 15, 2024, Plaintiff was hired by JMA for the position of Chief Information Officer responsible for managing the Information Technology (IT) Department.

18. The hiring of Plaintiff by JMA followed an offer letter Plaintiff received from JMA dated December 18, 2023, which the parties signed, which outlined terms and conditions of Plaintiff's forthcoming employment with JMA (the "Offer Letter").

19. At the time of her hire by JMA, and at all relevant times before and after that, Plaintiff resided in Chester Springs, Pennsylvania.

20. At all relevant times, JMA's global headquarters have been located in Syracuse, New York, but JMA agreed that Plaintiff could work remotely from Pennsylvania, where Plaintiff resided; and the Offer Letter stated that Plaintiff would be expected to relocate to Syracuse by September 2025.

21. At the inception of her employment with JMA, Plaintiff reported to Mr. Mezzalingua, JMA's CEO.

22. In April 2024, Mr. Mezzalingua implemented an organizational change at JMA, as a result of which Plaintiff began reporting to Andrew Adams, JMA's Chief Operating Officer.

23. Plaintiff reported to Mr. Adams from April of 2024 until April 12, 2025, when she was informed by JMA that she would now be reporting to Linda Chapman, JMA's Vice-President of Human Resources.

24. Plaintiff reported to Ms. Chapman from April 12, 2025 until Plaintiff's employment was terminated by JMA on June 20, 2025.

25. From the time Plaintiff was hired by JMA in January 2024 until March 2024, as agreed by Plaintiff and JMA, Plaintiff generally traveled to Syracuse on a weekly basis, and she otherwise worked remotely for JMA in Pennsylvania.

26. From March 2024 until January 2025, Plaintiff generally traveled to Syracuse for one week each month and continued working for JMA in Pennsylvania the rest of the time; and JMA supported and did not object to that work arrangement, which was consistent with the Offer Letter.

27. Prior to January 2025, neither Mr. Adams nor Mr. Mezzalingua criticized Plaintiff's work performance or raised with her any alleged performance deficiency, as a result of which Plaintiff understood that JMA was satisfied with her performance.

28. In the first full year of her employment with JMA, the IT team that Plaintiff managed exceeded performance expectations and met budgetary goals established by JMA.

### B. Facts Establishing that Plaintiff Was a Victim of Discrimination and Retaliation Related to Her Disability

29. On January 16, 2025, Plaintiff informed Mr. Adams during a 1:1 teams meeting that she had recently been diagnosed with breast cancer.

30. On January 17, 2025, Plaintiff informed Mr. Mezzalingua of her cancer diagnosis.

31. At a 1:1 teams meeting on January 31, 2025, with Plaintiff participating from her home in Pennsylvania, Mr. Adams raised with Plaintiff, for the first time,

performance issues related to the IT team that Plaintiff managed; and Plaintiff disputed his criticisms, which she believed were unfounded.

32. At a 1:1 teams meeting that Plaintiff had with Mr. Adams on February 20, 2025, with Plaintiff again participating from her home in Pennsylvania (the "February 20 Meeting"),Mr. Adams again brought up performance issues relating to the IT department; and he specifically stated that IT personnel needed to be physically present in Syracuse, which Plaintiff understood was a reference to her remote work arrangement.

33. Plaintiff informed Mr. Adams during the February 20 Meeting that due to her upcoming cancer surgery and the medical treatments that would follow near her home in Pennsylvania, she would not be able to travel a lot to Syracuse for the next six months, but her travel restrictions could be dealt with without a major disruption to JMA's business.

34. Plaintiff reminded Mr. Adams during the February 20 Meeting that she had not been in Syracuse most of the time in 2024; and as stated above, Plaintiff's agreement with JMA was that she was expected to relocate to Syracuse by September 2025.

35. On February 21, 2025, Plaintiff sent an email to Mr. Adams and Mr. Mezzalingua informing them that the surgery for her cancer had been scheduled for March 10, 2025, and that although her recovery was expected to take between 6 and 8 weeks, the worst of it would probably be in the first two weeks.

36. Plaintiff further stated in her February 21, 2025 email that within two weeks of her surgery, she would receive the pathology results that would confirm whether or not her cancer had metastasized, which would drive the next steps of her

treatment; and she further stated that she would do her best to minimize any impact that her medical condition would have on JMA.

37. The pathology report that followed Plaintiff's surgery confirmed that her cancer had spread; and Plaintiff promptly informed Mr. Adams and Mr. Mezzalingua that she had been diagnosed with metastatic breast cancer.

38. As early as March 14, 2025, which was only four days after her surgery, Plaintiff resumed taking meetings and doing other work for JMA from her home in Pennsylvania.

39. In a 1:1 teams meeting that Plaintiff had with Mr. Adams on March 27, 2025, in which Plaintiff participated from her home in Pennsylvania (the "March 27 Meeting"), Mr. Adams criticized Plaintiff for not being physically present in Syracuse, even though he was well aware of Plaintiff's disability.

40. As proven by the practice that had been followed by Plaintiff and JMA prior to the onset of Plaintiff's disability, and as confirmed in the Offer Letter, it was unnecessary for Plaintiff to be physically present in Syracuse on a consistent basis to perform her job.

41. Furthermore, as of the time of the March 27 Meeting, Mr. Adams was well aware that Plaintiff had travel restrictions due to her medical condition and disability, and the treatment she was receiving for it.

42. Plaintiff pointed out to Mr. Adams during the March 27 Meeting that most of the IT operations team that she managed was not physically present in Syracuse.

43. In a 1:1 teams meeting that Plaintiff had with Mr. Adams on March 28, 2025, in which Plaintiff again participated from her home in Pennsylvania (the "March 28 Meeting"), Mr. Adams warned Plaintiff that "a key issue still left is the need to have the

[IT] team here [in Syracuse], specifically you;" and while he acknowledged that he knew Plaintiff would be unable to travel to Syracuse until September 2025 due to her medical condition and disability, he still told Plaintiff, "we need to fix it, it needs to be now."

44. When Plaintiff told Mr. Adams during the March 28 Meeting that she would come to Syracuse as much as she was able to given her medical condition and in between her treatments, Mr. Adams responded, "I think we're beyond that, I just don't think this is going to work" and "you're not here [in Syracuse] and I have to have a solution and you're not getting it."

45. At that point in the March 28 Meeting, Mr. Adams said to Plaintiff, "this isn't working, we're going to change and that means, at this point I need your resignation."

46. In response to the demand for her resignation, Plaintiff told Mr. Adams during the March 28 Metting that she would not resign, to which Mr. Adams responded that JMA needed to move "in a different direction," and that JMA would have to "come up with a transition plan" for Plaintiff.

47. Mr. Adams also told Plaintiff during the March 28 Meeting that JMA was going to change its leadership and eliminate Plaintiff's role; and when Plaintiff responded by asking Mr. Adams if that meant he was terminating her employment, he answered, "yes."

48. JMA and Mr. Adams demanded Plaintiff's resignation and terminated her employment during the March 28 Meeting because of her disability and her request for the reasonable accommodation of a travel restriction for her disability.

49. JMA took the adverse action against Plaintiff in the March 28 Meeting even though it had agreed when it hired Plaintiff that she would not have to relocate to

Syracuse until September 2025, and Plaintiff was able to perform the essential functions of her job remotely notwithstanding her disability.

50. On April 1, 2025, Plaintiff received an email from Mr. Adams, on which Ms. Chapman was copied, in which Plaintiff was provided with "an updated transition plan," with two options for severance and health insurance.

51. Plaintiff responded to Mr. Adams' email with an email on April 1, 2025, in which she stated, in relevant part, "[i]t is certainly not my choice to separate from the company and I have not resigned, but as you expressed to me on [March 28, 2025], that decision has already been made."

52. On April 3, 2025, Plaintiff sent an email to Ms. Chapman in which she stated, among other things, that:

(a) She had informed Mr. Adams on February 20, 2025 that due to her upcoming surgery for cancer and the treatments that would follow, she would be unable to travel very much for the next six months;

(b) On March 27, 2025, Mr. Adams had criticized her for not being in Syracuse even though it was unnecessary for her to be there to perform her job and Mr. Adams knew she had travel restrictions due to her medical condition;

(c) On March 28, 2025, when she told Mr. Adams that she would come to Syracuse as much as she could following her surgery and in between her treatments, Mr. Adams responded that because she was not physically present in Syracuse, that arrangement was "not going to work;"

(d) Mr. Adams had demanded her resignation on March 28, 2025, informing her that her employment was terminated after she told him she would not resign; and

(e) Prior to her cancer diagnosis, she had worked for JMA remotely in Pennsylvania more often than she had worked in Syracuse.

53. JMA's Offer Letter, which was signed by Ms. Chapman, stated that it was expected that Plaintiff would relocate to Syracuse by September 2025, not in February or March of 2025.

54. On April 12, 2025, Plaintiff received an email from Mr. Adams, on which Ms. Chapman was copied, in which Mr. Adams stated that:

(a) JMA wanted to reestablish a working relationship with Plaintiff;

(b) Mr. Adams was happy to hear that Plaintiff had "no restrictions on [her] ability to work;"

(c) It was JMA's position that the performance of the IT team was "well below expectations;"

(d) It was the goal of JMA to have Plaintiff continue to lead the IT team and produce success;

(e) "[E]stablishing a greater presence in Syracuse" was necessary for Plaintiff because "the current remote situation" was not working; and

(f) Plaintiff's reporting responsibilities were being changed in that she would now be reporting to Ms. Chapman.

55. On April 14, 2025, Plaintiff responded via email to Mr. Adams's April 12, 2025 email, with a copy to Ms. Chapman, and stated that:

(a) On March 28, 2025, Mr. Adams had demanded Plaintiff's resignation and informed her that her employment was terminated when she refused to resign;

(b) This action was taken after Plaintiff had told Mr. Adams that she would not be able to work regularly or consistently in Syracuse until around September 2025 due to her diagnosis of metastatic breast cancer, and her corresponding treatments and recovery times;

(c) JMA had not been informed by Plaintiff that she had "no restrictions;"

(d) On the contrary, Plaintiff was unable to establish "a greater presence in Syracuse" due to her disability;

(e) Plaintiff would travel to Syracuse as much as she was able to given her disability and medical condition;

(f) Plaintiff had received no criticism of her performance until after she had informed JMA of her medical diagnosis; and

(g) Plaintiff was coping with a diagnosis of metastatic cancer to be followed by extensive medical treatment while she was dealing with JMA's discriminatory conduct.

56. On April 15, 2025, Plaintiff participated from Pennsylvania in a phone call with Ms. Chapman and JMA's in-house counsel, Jaime Vaccaro (the "April 15 Call"), in which Plaintiff complained that Mr. Adams had terminated her employment due to her inability to travel to Syracuse, only after she had informed him of her cancer diagnosis.

57. Plaintiff further stated on the April 15 Call that no criticisms of her performance had been brought to her attention prior to the disclosure of her diagnosis; and when Ms. Chapman and/or Ms. Vaccaro disagreed with Plaintiff and said during the April 15 Call that there were performance issues before JMA learned of Plaintiff's cancer diagnosis, Plaintiff disputed it.

58. When Plaintiff reminded Ms. Chapman and Ms. Vaccaro on the April 15 Call that prior to her disclosure of her diagnosis and JMA's demand for her resignation, she had been working remotely from Pennsylvania without objection, Ms. Vaccaro responded that Plaintiff's physical presence in Syracuse was "important."

59. Ms. Vaccaro assured Plaintiff on the April 15 Call that her employment with JMA was not terminated and that "we're moving forward;" and Ms. Chapman stated on the April 15 Call that as Plaintiff's new supervisor, she would be performing her own assessment of Plaintiff's future performance.

60. On April 25, 2025, Plaintiff received an email from Ms. Vaccaro stating that she had done an investigation of Plaintiff's discrimination complaint, which was limited to interviews of Plaintiff and Mr. Adams as well as a review of their emails, and that her investigation did not substantiate a finding of discrimination.

61. On April 28, 2025, Plaintiff responded by email to Ms. Vaccaro's April 25, 2025 email, in which she stated, among other things, that:

(a) "[A] fair and unbiased investigation would have revealed that [JMA] never made [her] job performance an issue with [her] until after [she] told the company about [her] cancer diagnosis and requested a reasonable accommodation for treatment and travel;"

(b) She still had not been provided with an explanation for JMA's demand for her resignation or the termination of her employment after she refused to resign;

(c) It was not appropriate for the investigation of her discrimination complaint to be handled by Ms. Vaccaro, who had provided Plaintiff with negative anecdotal comments about the IT department during the April 15 Call; and

(d) She was continuing to experience discrimination and retaliation that was making her job more difficult to perform, including that JMA's leadership was bypassing her to speak directly to her team members, which had not happened before, and that available resources for her department were dwindling.

62. On April 29, 2025, Plaintiff received a reply email from Ms. Vaccaro asking her for a written complaint that detailed the alleged instances of discrimination and retaliation.

63. On May 7, 2025, as requested by Ms. Vaccaro, Plaintiff sent Ms. Vaccaro an email that repeated the factual basis for her claim of disability discrimination.

64. Plaintiff complained to Ms. Vaccaro in her May 7, 2025 email that JMA had recently cut resources from the IT team's budget for 2025; that JMA had rejected offer letters for her research candidates on the basis that the candidates would not be working full-time in Syracuse, even though there was no company policy mandating in-office work and many of JMA's new hires worked remotely or on a hybrid basis; and that the lack of resources, unfair treatment related to remote work, refusal to document performance issues, and demand for her resignation followed by notification of her termination led her to believe that JMA was setting her up to fail in 2025 because of her disability and her complaints of discrimination.

65. On May 7, 2025, Ms. Vaccaro responded via email to Plaintiff's May 7, 2025 email, and stated that Plaintiff's employment had not been terminated and that Ms. Chapman would focus on Plaintiff's performance expectations for the current year.

66. The statements made by Ms. Vaccaro in her May 7, 2025 email caused Plaintiff to believe that JMA had no plans to terminate her employment again, and that it would give her a fair opportunity to perform going forward.

67. Ms. Vaccaro also stated in her May 7, 2025 email that JMA would provide Plaintiff with any reasonable accommodation she would need for her disability.

68. In May 2025, Plaintiff discovered that Ms. Chapman had been meeting with members of Plaintiff's IT team without including or informing her.

69. On May 22, 2025, Plaintiff sent an email to Ms. Chapman complaining that she had become aware of Mr. Adams "speaking ill" of the IT department; and that Mr. Adams was "holding a grudge" and continuing with a "smear campaign" that had begun in February 2025.

70. On May 29, 2025, Plaintiff sent an email to Ms. Chapman complaining of Ms. Chapman's refusal to approve expenditures that Plaintiff needed for the IT department.

71. In May 2025, Plaintiff learned that Mr. Adams was planning to make changes in the IT department without consulting Plaintiff.

72. In May 2025, after Ms. Chapman had approved the hiring of two interns for the IT team as requested by Plaintiff, Ms. Chapman did an about-face, telling Plaintiff that no interns would be hired because their manager had to be on-site in Syracuse; and when Plaintiff informed Ms. Chapman that the leader on the IT team who would be managing the intern was on-site, Ms. Chapman still denied Plaintiff's request.

73. In May 2025 and June 2025, JMA and Ms. Chapman were continuing to marginalize and minimize Plaintiff's role as Chief Information Officer.

74. In June 2025, Plaintiff was undergoing radiation treatment for her cancer, of which JMA was aware.

75. In a 1:1 teams meeting that Plaintiff had with Ms. Chapman on June 17, 2025, in which Plaintiff participated from her home in Pennsylvania, Ms. Chapman

asked Plaintiff if she was planning to relocate to Syracuse in September 2025; and Plaintiff responded that because she had another surgery scheduled for October 2025, she probably would not be able to travel to Syracuse until the end of the year.

76. Three days later, on June 20, 2025, Ms. Chapman informed Plaintiff during a brief phone call that Plaintiff participated in from Pennsylvania that her employment with JMA was terminated, "due to [her] ambivalence toward the company."

77. Plaintiff was not "ambivalent" to JMA and was continuing to perform her job responsibilities to the best of her ability notwithstanding her disability and the discriminatory treatment she was receiving from JMA.

78. JMA's asserted reason for terminating Plaintiff's employment on June 20, 2025 was false and a pretext for disability discrimination and retaliation.

79. JMA terminated Plaintiff's employment on June 20, 2025 because of her disability, her complaints of disability discrimination, and her requests for an accommodation for her disability.

80. At all relevant times, Plaintiff was able to perform the essential duties of her position with JMA with the reasonable accommodation she requested and needed.

81. The fact that Ms. Chapman informed Plaintiff of her termination three days after Plaintiff had told her that she would not be able to work for JMA in Syracuse in September 2025 due to her medical condition and treatments, and that she would have to continue working in Pennsylvania until the end of the year, further supports Plaintiff's claim that she was a victim of disability discrimination and retaliation.

## COUNT I – ADA

## TERMINATION OF EMPLOYMENT BECAUSE OF DISABILITY AND REQUESTS FOR REASONABLE ACCOMMODATION

82. Plaintiff incorporates by reference all the allegations of Paragraphs 1 through 81, above, as if same were set forth fully and at length herein.

83. At all relevant times, Plaintiff had a "disability" within the meaning of the ADA.

84. At all relevant times, JMA, including its managers and officials who made or participated in the decision to terminate Plaintiff's employment, were aware of Plaintiff's disability.

85. At all relevant times, Plaintiff was a "qualified individual" within the meaning of the ADA.

86. Plaintiff informed JMA of her need for a reasonable accommodation for her disability, which was a travel restriction and a continuing remote work arrangement.

87. Plaintiff suffered materially adverse employment actions when JMA demanded her resignation and informed her of the termination of her employment on March 28, 2025, and then when it implemented the termination of her employment on June 20, 2025 (collectively, the "Adverse Acts").

88. JMA took the Adverse Acts against Plaintiff because of her disability.

89. JMA took the Adverse Acts against Plaintiff because of her requests for a reasonable accommodation for her disability.

90. Plaintiff's disability and requests for the reasonable accommodation were a motivating factor in JMA's decision to take the Adverse Acts.

91. As a result of the Adverse Acts taken by JMA in violation of the ADA, Plaintiff has suffered and will suffer economic harm in the form of lost wages, lost bonuses and loss of the value of employee benefits, thereby entitling Plaintiff to an award of back pay from the time of the termination of her employment on June 20, 2025 until the date a verdict is rendered in this case.

92. As a further result of the Adverse Acts taken by JMA in violation of the ADA, Plaintiff is entitled to an award of front pay equal to the present value of future wages, bonuses and employee benefits that she would have reasonably expected to earn from JMA had her employment not been terminated, reduced by the amount of wages, bonuses and benefits, if any, that she is expected to receive from other employment from the date a verdict is rendered in this case until the end of her work life expectancy.

93. As a further result of the Adverse Acts taken by JMA in violation of the ADA, and the effect they have had and will have on her, Plaintiff is entitled to an award of compensatory damages for past and future pain and suffering, mental anguish, inconvenience, embarrassment and humiliation, loss of self-esteem, and loss of enjoyment of life.

94. The Adverse Acts taken by JMA in violation of the ADA were implemented by one or more management officials of JMA, acting with malice and/or reckless indifference to Plaintiff's federally protected rights, thereby entitling Plaintiff to an award of punitive damages.

95. Plaintiff is entitled to a declaratory judgment that JMA violated her rights under the ADA when it took the Adverse Acts, as well as equitable relief enjoining JMA from committing further violations of the ADA.

96. Plaintiff is entitled to an award of prejudgment interest on any award of damages that is rendered in her favor.

97. Plaintiff is entitled to an award of reasonable attorney's fees and costs.

## COUNT II – PHRA

## TERMINATION OF EMPLOYMENT BECAUSE OF DISABILITY AND REQUESTS FOR REASONABLE ACCOMMODATION

98. Plaintiff incorporates by reference all the allegations of Paragraphs 1 through 97, above, as if same were set forth fully and at length herein.

99. At all relevant times, Plaintiff had a disability within the meaning of the PHRA.

100. At all relevant times, JMA, including its managers and officials who made or participated in the decision to terminate Plaintiff's employment, were aware of Plaintiff's disability.

101. At all relevant times, Plaintiff was a qualified individual within the meaning of the PHRA.

102. Plaintiff informed JMA of her need for a reasonable accommodation for her disability, which was a travel restriction and a continuing remote work arrangement.

103. Plaintiff suffered the Adverse Acts when JMA demanded her resignation and informed her of the termination of her employment on March 28, 2025, and then when it implemented the termination of her employment on June 20, 2025.

104. JMA took the Adverse Acts against Plaintiff because of her disability.

105. JMA took the Adverse Acts against Plaintiff because of her requests for a reasonable accommodation for her disability.

106. Plaintiff's disability and requests for the reasonable accommodation were a motivating factor in JMA's decision to take the Adverse Acts.

107. As a result of the Adverse Acts taken by JMA in violation of the PHRA, Plaintiff has suffered and will suffer economic harm in the form of lost wages, lost bonuses and loss of the value of employee benefits, thereby entitling Plaintiff to an award of back pay from the time of the termination of her employment on June 20, 2025 until the date a verdict is rendered in this case.

108. As a further result of the Adverse Acts taken by JMA in violation of the PHRA, Plaintiff is entitled to an award of front pay equal to the present value of future wages, bonuses and employee benefits, if any, that she would have reasonably expected to earn from JMA had her employment not been terminated, reduced by the amount of wages, bonuses and benefits, if any, that she is expected to receive from other employment from the date a verdict is rendered in this case until the end of Plaintiff's work life expectancy.

109. As a further result of the Adverse Acts taken by JMA in violation of the PHRA, and the effect they have had and will have on her, Plaintiff is entitled to an award of compensatory damages for past and future pain and suffering, mental anguish, inconvenience, embarrassment and humiliation, loss of self-esteem, and loss of enjoyment of life.

110. Plaintiff is entitled to a declaratory judgment that JMA violated her rights under the PHRA when it took the Adverse Acts, as well as equitable relief enjoining JMA from committing further violations of the PHRA.

111. Plaintiff is entitled to an award of prejudgment interest on any award of damages that is rendered in her favor.

112. Plaintiff is entitled to an award of reasonable attorney's fees and costs.

## COUNT III – ADA

### TERMINATION OF EMPLOYMENT IN RETALIATION FOR COMPLAINTS OF DISABILITY DISCRIMINATION AND REQUESTS FOR REASONABLE ACCOMMODATION

113. Plaintiff incorporates by reference all the allegations of Paragraphs 1 through 112, above, as if same were set forth fully and at length herein.

114. Plaintiff engaged in protected activity under the ADA when she complained to JMA of disability discrimination.

115. Plaintiff engaged in protected activity under the ADA when she requested the reasonable accommodation for her disability.

116. JMA took the Adverse Acts against Plaintiff.

117. The Adverse Acts taken by JMA against Plaintiff would deter a reasonable person from opposing or complaining of discrimination, or requesting a reasonable accommodation for their disability.

118. JMA took the Adverse Acts against Plaintiff because of the protected activity that she engaged in.

119. As a result of JMA's retaliatory action against Plaintiff in violation of the ADA, Plaintiff has suffered and will suffer economic harm in the form of lost wages, lost bonuses and loss of the value of employee benefits, thereby entitling Plaintiff to an award of back pay from the time of the termination of employment until the date when a verdict is rendered in this case.

120. As a further result of JMA's retaliatory action against Plaintiff in violation of the ADA, Plaintiff is entitled to an award of front pay equal to the present value of future wages, bonuses and employee benefits that she would have reasonably expected to

earn from JMA had her employment not been terminated, reduced by the amount of wages, bonuses and benefits, if any, that she is expected to receive from other employment from the date a verdict is rendered in this case until the end of Plaintiff's work life expectancy.

121. As a further result of JMA's retaliatory action against Plaintiff in violation of the ADA, and the effect it has had and will have on her, Plaintiff is entitled to an award of compensatory damages for past and future pain and suffering, mental anguish, inconvenience, embarrassment and humiliation, loss of self-esteem, and loss of enjoyment of life.

122. JMA's retaliatory action against Plaintiff was implemented by one or more management officials of JMA, acting with malice and/or reckless indifference to Plaintiff's protected rights, thereby entitling Plaintiff to an award of punitive damages.

123. Plaintiff is entitled to a declaratory judgment that JMA violated her rights under the ADA when it took the retaliatory action, as well as equitable relief enjoining JMA from committing further violations of the ADA.

124. Plaintiff is entitled to an award of prejudgment interest on any award of damages that is rendered in her favor.

125. Plaintiff is entitled to an award of reasonable attorney's fees and costs.

## COUNT IV – PHRA

### TERMINATION OF EMPLOYMENT IN RETALIATION FOR COMPLAINTS OF DISABILITY DISCRIMINATION AND REQUESTS FOR REASONABLE ACCOMMODATION

126. Plaintiff incorporates by reference all the allegations of Paragraphs 1 through 125, above, as if same were set forth fully and at length herein.

127. Plaintiff engaged in protected activity under the PHRA when she complained to JMA of disability discrimination.

128. Plaintiff engaged in protected activity under the PHRA when she requested a reasonable accommodation for her disability.

129. JMA took the Adverse Acts against Plaintiff.

130. The Adverse Acts taken by JMA against Plaintiff would deter a reasonable person from opposing or complaining of discrimination, or requesting a reasonable accommodation for their disability.

131. JMA took the Adverse Acts against Plaintiff because of the protected activity that she engaged in.

132. As a result of JMA's retaliatory action against Plaintiff in violation of the PHRA, Plaintiff has suffered and will suffer economic harm in the form of lost wages, lost bonuses and loss of the value of employee benefits, thereby entitling Plaintiff to an award of back pay from the time of the termination of employment until the date when a verdict is rendered in this case.

133. As a further result of JMA's retaliatory action against Plaintiff in violation of the PHRA, Plaintiff is entitled to an award of front pay equal to the present value of future wages, bonuses and employee benefits that she would have reasonably expected to earn from JMA had her employment not been terminated, reduced by the amount of wages, bonuses and benefits, if any, that she is expected to receive from other employment from the date a verdict is rendered in this case until the end of Plaintiff's work life expectancy.

134. As a further result of JMA's retaliatory action against Plaintiff in violation of the PHRA, and the effect it has had and will have on her, Plaintiff is entitled to an award

of compensatory damages for past and future pain and suffering, mental anguish, inconvenience, embarrassment and humiliation, loss of self-esteem, and loss of enjoyment of life.

135. Plaintiff is entitled to a declaratory judgment that JMA violated her rights under the PHRA when it took the retaliatory action, as well as equitable relief enjoining JMA from committing further violations of the PHRA.

136. Plaintiff is entitled to an award of prejudgment interest on any award of damages that is rendered in her favor.

137. Plaintiff is entitled to an award of reasonable attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter a judgment in her favor against JMA for the following relief:

A. A declaratory judgment that the acts and practices of JMA complained of herein were in violation of the ADA and the PHRA;

B. An injunction and other appropriate equitable relief including without limitation enjoining JMA from committing further violations of the ADA and the PHRA, and compelling JMA to take proper measures to prevent further violations;

C. Awarding Plaintiff back pay in the form of lost wages, loss of earnings, lost bonuses, and loss of the value of employee benefits;

D. Awarding Plaintiff front pay representing future lost wages, loss of earnings, lost bonuses, and loss of the value of employee benefits;

E. In lieu of front pay, ordering the reinstatement of Plaintiff to the employment of JMA with all attendant rights and benefits;

F. Awarding compensatory damages to Plaintiff for pain and suffering, mental anguish, emotional distress, inconvenience, embarrassment and humiliation, loss of self-esteem, and loss of enjoyment of life;

G. Awarding prejudgment interest to Plaintiff;

H. Awarding punitive damages to Plaintiff;

I. Awarding Plaintiff reasonable attorney's fees and costs of suit; and

J. Granting such other relief that is just and appropriate.

SIDKOFF, PINCUS & GREEN, P.C.

Robert A. Davitch, Esq.

Casey Green, Esq.

1101 Market Street, Suite 2700
Philadelphia, PA 19107
(215) 574-0600 – Office
(215) 574-0310 – Fax
rad@sidkoffpincusgreen.com
cg@sidkoffpincusgreen.com

Attorneys for Plaintiff, Christine Reidy

Date: 11/18/2026

# EXHIBIT A

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Philadelphia District Office**
801 Market St, Suite 1000
Philadelphia, PA 19107
(267) 589-9700
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 8/27/2026

**To:** Christine Reidy
801 Upper Pine Creek Road
Chester Springs, PA 19425

Charge No: 17F-2025-61066
EEOC Representative and email: State Local and Tribal Program Manager
PHLSTATEANDLOCAL@EEOC.GOV

---

**NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)**

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

**NOTICE OF YOUR RIGHT TO SUE**

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On Behalf of the Commission:

Digitally Signed By: Karen McDonough 8/27/2026

Karen McDonough
Deputy District Director

cc:

For Respondent
Dana B Hasness Esq.
Jackson Lewis, P.C.
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102

For Charging Party
Robert A Davitch
Sidkoff Pinkus & Green
1101 Market Street
Philadelphia, PA 19107

Please retain this notice for your records.

# EXHIBIT B

Pennsylvania
Human Relations Commission

July 30, 2026

Christine Reidy
801 Upper Pine Creek Road
Chester Springs, PA 19425

RE: Christine Reidy vs. JMA Wireless; John Mezzalingua Associates, LLC d/b/a JMA Wireless
PHRC Case No. 202500565

Dear Christine,

It has been at least one year since you filed your complaint with the Pennsylvania Human Relations Commission. This is to notify you that you now have the right to bring an action in the appropriate Pennsylvania Court of Common Pleas based on the alleged violations of the PHRAct contained in your Commission complaint. This right is provided under Section 12(c) of the Human Relations Act, 43, P.S. § 962(c).

Please be advised that you are not required to file such an action in the State Court of Common Pleas. The Commission is continuing to process your case, and we will make every effort to resolve it as soon as possible. If we are not notified otherwise, we will assume that you want the Commission to continue handling your case.

If you do file a complaint in a Court of Common Pleas, the Commission will dismiss your complaint. This means that you will be unable to have the Commission decide your case even if your complaint is dismissed in State Court because of a procedural error. Procedural errors may include filing the complaint in State Court in the wrong county or filing in State Court after your time to file has expired. For this reason, you should make every effort to assure that any complaint you file in State Court will be properly filed before you file it.

If you believe you might want to take your case to State Court, we suggest that you consult a private attorney about representing you in that action. This should be done before you file the complaint so that your attorney may advise you on the best course of action for you to take.

Should you file a complaint in State Court, you are required by Section 12(c)(2) of the Pennsylvania Human Relations Act to serve the Human Relations Commission with a copy of the Court complaint. This copy must be served on the Commission at the same time you file it in Court. The copy is to be sent to the investigator assigned to your case.

If you have any questions concerning this matter, please feel free to contact the investigator who is handling your case.

Sincerely,
Enforcement Division
PA Human Relations Commission

cc: Robert A. Davitch
Sidkoff Pinkus & Green
1101 Market Street, Suite 2700
Philadelphia, PA 19107